UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------X



STACEY GOLDEN, Individually and on
behalf of all other persons
similarly situated,

                06 Civ. 2970 (RWS)

          Plaintiff,

                OPINION

   -against-

MERRILL LYNCH & CO., INC. and
MERRILL LYNCH, PIERCE, FENNER &
SMITH, INC.

        Defendants.

-------------------------------------X

A P P E A R A N C E S:

        Attorneys for Plaintiff

        LOCKS LAW FIRM, PLLC
        110 East 55th Street, 12th Floor
        New York, NY  10022
        By:  Fran Rudich, Esq.
            Seth R. Lesser, Esq.

        BROMBERG LAW OFFICE, P.C.
        40 Exchange Place, Suite 2010
        New York, NY  10005
        By:  Brian L. Bromberg, Esq.

        BERGER & GOTTLIEB
        150 East 18th Street, Suite PHR
        New York, NY  10003
        By:  Jeffrey Gottlieb, Esq.

        Attorneys for Defendants

        MUNGER, TOLLES & OLSON LLP
        355 South Grand Avenue, 35th Floor
        Los Angeles, CA  90071-1560
        By:  Terry E. Sanchez, Esq.
            Katherine M. Forster, Esq.

1

**Sweet, D.J.**

Defendants Merrill Lynch & Co., Inc. and Merrill Lynch, Pierce, Fenner & Smith, Inc. (collectively, "Merrill" or the "Defendants") have moved under Rule 56, Fed. R. Civ. P. to dismiss the complaint of plaintiff Stacey Golden ("Golden" or the "Plaintiff"), former employee of Merrill, which alleged that she was misclassified as an exempt employee under the Fair Labor Standards Act ("FLSA") and the New Jersey Wage and Hour Act ("NJWHA") and is owed overtime pay.

For the reasons set forth below, the motion is granted, and the complaint is dismissed.

## **Prior Proceedings**

Golden filed her complaint on April 18, 2006 on her own behalf and on behalf of a putative FLSA collective class consisting of all "operation center support staff" in the United States and a putative state law class consisting of support staff at operation centers alleging violations of the Fair Labor Standards Act ("FSLA"), 29 U.S.C. § 216(b) and the New Jersey Wage and House Act, N.J. Stat. Ann. § 34:11-56 ("NJWHA").

2

Discovery proceeded and the instant motion was heard
and marked fully submitted on May 23, 2007.

## The Facts

The facts are contained in the Defendants' Local Civil
Rule 56.1 Statement and Plaintiff's Response to Defendants'
Local Civil Rule 56.1 Statement.

The following facts are not in dispute.

Merrill Lynch employed Plaintiff from December 1994
until June 2004, at which time she resigned to take another job.
(Golden Dep. at 11.)

During the time relevant to this lawsuit, Golden was
employed at Merrill's Operations Center located in Pennington,
New Jersey. (Compl. ¶ 23.)

From 2002 until the time she left the Operations
Center in June 2004, Plaintiff was a Merrill Lynch Service
Network ("MLSN") Supervisor. (Golden Dep. at 29.)

Plaintiff reviewed her employees' online time sheets for accuracy and signed off on them. (Golden Dep. at 57-58.)

Plaintiff developed and trained the representatives who reported to her, including making sure they knew their job responsibilities, making sure they were able to handle calls and helping them with any questions they had. (Golden Dep. at 52.)

Plaintiff reviewed statistical reports on how many calls her representatives took and how long the calls were. (Golden Dep. at 82-83.)

Plaintiff ran the team meetings for her unit approximately 50% of the time. (Golden Dep. at 84-85.)

Plaintiff performed her duties with only general supervision. Her supervisor's office was in a different building and he did not engage in the day-to-day supervision of the representatives reporting to Plaintiff. Plaintiff and her manager typically talked by telephone once a day in which they would discuss various issues concerning her unit and/or any issues she believed she should raise with her manager. They met in person approximately one time per week for an hour to discuss, among other things, the performance of her unit and any

4

Merrill initiatives. (Golden Dep. at 126-27; Theologis Decl., Ex. B; Rogan Decl. ¶ 6.)

Plaintiff attempted to deal with elevated calls by using her judgment on what could be done within the unit's unwritten guidelines. She made that determination by using her best judgment or determining if it needed to be elevated to higher management. (Golden Dep. at 66-67.)

At times, Plaintiff interfaced with supervisors in other departments in order to deal with the elevated calls. (Golden Dep. at 65-66.)

Plaintiff would get on the phone lines if her unit was shorthanded or there was a high call volume. (Golden Dep. at 68.) Plaintiff has admitted that this did not occur every day and she had no estimate how many days in a week or a month that she did so. (Golden Dep. at 68-69.)

Plaintiff's performance as a MLSN supervisor was evaluated in writing. (Golden Dep. at 48-49.)

The evaluation process began by Plaintiff filling out her objectives for her or her unit. Her prepared objectives

were then reviewed by her Section Manager. The Section Manager could agree with her objectives or add to or subtract from them. (Golden Dep. at 49.)

Eventually, the objectives were agreed upon and set forth in her evaluation form. (Golden Dep. at 73-74, 85.)

Plaintiff has admitted that she had agreed to the objectives set forth in her evaluation form, that they reflected her responsibilities, and that she worked to achieve them. (Golden Dep. at 73-74, 77, 97.)

Plaintiff testified that she believed her comments and those of her management in her performance evaluations were accurate. (Golden Dep. at 75-76, 101, 109.)

Plaintiff commented in her 2002 evaluation that she "worked to meet the majority of my objectives within our ever changing environment." (Sanchez Decl., Ex. B at 18.)

In Plaintiff's 2002 evaluation, her manager commented, "Although Stacy lacks the background to supervise in a call center environment she willingly accepted this role and with

6

minimal training has realized a good grasp of her role."
(Sanchez Decl., Ex. B at 19.)

Plaintiff stated in her 2003 evaluation that the
monitoring of calls had increased to twenty-five per month and
employees were scheduled for one-on-one meetings on a monthly
basis. (Sanchez Decl., Ex. C at 3.)

In her 2003 evaluation, Plaintiff's manager commented
on Plaintiff's job responsibilities as follows: "Service
Statistics that Stacy was responsible for showing outstanding
results." (Sanchez Decl., Ex. C at 3.)

Plaintiff's manager also noted the reorganization of
the unit had "enlarged Stacy's responsibilities . . . and should
allow Stacy the opportunities to demonstrate her supervisory
skills, creativity, initiative and accomplishments." (Sanchez
Decl., Ex. C at 4.) Plaintiff has admitted that this was noted
in her 2003 evaluation, but has denied that her responsibilities
were enlarged at that time. (Golden Decl. ¶¶ 15-17, 19.)
Plaintiff has admitted that she had no reason to believe that
her manager's comments were inaccurate. (Golden Dep. at 109.)

Plaintiff received a salary of at least $1,960 every two weeks during the relevant time period. (Golden Dep. at 113, 115.) Golden's pay stubs confirm that she received a bi-weekly salary of at least $1,960 in 2003 and $2,015.38 beginning in February 2004. (Rozolis Decl. ¶ 3.)

Golden's salary was not subject to deduction except for federal and state taxes, employee benefit programs (flexible spending account for dependent care, 401(k), various types of insurance, employee stock purchase plan) and a voluntary charitable contribution to the United Way. (Rozolis Decl. ¶ 4.)

The following facts are in dispute.

In her position as MLSN Supervisor, Plaintiff supervised a call center unit that specialized in answering questions from Merrill Lynch branch offices regarding tax reporting and client statements. (Golden Dep. at 33.) Plaintiff has denied that she "supervised" in any meaningful way the call center and has stated that her manager, Sean Rogan ("Rogan"), basically ran this office. (Golden Decl. ¶¶ 19-26.)

When Plaintiff initially became a supervisor, she supervised five or six employees in the unit. (Golden Dep. at

34-35.) Plaintiff has denied that she had any meaningful supervisory responsibilities over these employees.

Subsequently, another supervisor transferred out and Golden became the sole supervisor for the Tax Reporting and Statement Quality Assurance Department ("SQAD") unit, which consisted of ten to twelve employees (sometimes called "representatives"). (Golden Dep. at 35.) Plaintiff has denied that she had any meaningful supervisory responsibilities over them.

Plaintiff supervised the day-to-day activities of these employees in her unit. (Golden Dep. at 63.) Plaintiff has denied this characterization of her deposition.

Plaintiff scheduled the employees in her unit to cover the phone lines and scheduled their hours and their days off. (Golden Dep. at 57; Rogan Decl. ¶ 4.) Plaintiff has denied this characterization of her deposition.

Plaintiff monitored the calls of the representatives who reported to her to ensure they were performing satisfactorily. (Golden Dep. at 54, 82; Rogan Decl. ¶ 4.) Plaintiff denied having this duty. (Golden Decl. ¶ 19.)

9

Plaintiff supervised the performance of her unit to ensure that her representatives were achieving the matrices or goals of the unit. (Golden Dep. at 63.) Plaintiff has denied this statement without citation.

Plaintiff evaluated and reviewed the people who reported to her. (Golden Dep. at 50-51.) Plaintiff has denied this statement. (Golden Decl. ¶ 24.)

Plaintiff experimented with ways to sustain and increase the morale of her unit. (Golden Dep. at 111-12.) Plaintiff has denied it was her unit. (Golden Decl. ¶¶ 1-44.)

Plaintiff addressed performance issues with her representatives such as if they were late or not meeting their matrix goals. (Golden Dep. at 53.) Plaintiff has denied this characterization of her duties. (Golden Dep. at 53.)

Plaintiff recommended to her section manager that a representative be disciplined. (Golden Dep. at 54.) Plaintiff has denied this statement. (Golden Decl. ¶ 23.)

Plaintiff's job duties included the following: scheduling the employees who reported to her; regularly monitoring the representatives' phone calls for professionalism, technical proficiency and quality; holding one-on-one meetings with her representatives to discuss, among other things, their performance, the quality and quantity of calls and adherence to call schedules; evaluating her representatives' performance twice a year; maintaining relationships with the management of processing areas and/or branch office management; recommending and/or making personnel decisions; overseeing and ensuring training; leading team meetings; looking for ways to improve processes in her unit; handling elevated calls that representatives could not handle on their own or when the caller requested to speak to a supervisor and resolving those issues; being responsible for and ensuring the performance of her unit against objectives for call volume, length of call, quality, and schedule adherence; maintaining employee morale; reviewing and approving her representatives' time cards; and directing employees' work. (Rogan Decl. ¶ 4.) Plaintiff has denied this statement. (Golden Decl. ¶¶ 19, 20, 24.)

Plaintiff's supervisory duties were critical to the operation and success of her unit. (Rogan Decl. ¶ 4.) Plaintiff has denied this statement. (Golden Decl. ¶¶ 28-29.)

11

Asked at her deposition, "Out of all the duties that we have discussed as you sit here today, can you give . . . an estimate of how many hours you spent on each of them during a normal week?" Plaintiff responded, "No, I have no idea." (Golden Dep. at 152.) Plaintiff has admitted that she was asked that question at her deposition, but has denied that she in fact does not know how many hours she spent on her duties during a normal week. (Golden Decl. ¶¶ 39-40.)

MLSN supervisors, including Plaintiff, had the authority to make and/or recommend personnel decisions such as discipline, hiring, firing and promotions. Their manager gave their recommendations particular weight when he became involved in making such decisions. (Rogan Decl. ¶ 5.) Plaintiff has denied this statement. (Golden Decl. ¶¶ 22-23.)

Plaintiff regularly exercised discretion and judgment in performing her duties. She determined the scheduling of representatives and scheduled their vacations and breaks. She decided what calls to monitor and how to evaluate the quality of the calls. She was responsible for meeting with each of the representatives who reported to her to discuss their performance, quality and schedule adherence. She used her

12

judgment and discretion in deciding how to resolve elevated
calls, which included clients who were upset and/or who
presented complex issues that could not be handled by her
representatives. She also decided whether to seek assistance
from other departments to resolve the issue or to elevate the
issues to the Section Manager. (Rogan Decl. ¶ 6.) Plaintiff
has denied this statement. (Golden Decl. ¶¶ 14-29, 43.)

During the tax season from January through April,
Merrill Lynch added approximately fifty temporary employees to
create a "tax phone room." One or more of her staff members
would be assigned to supervise in the tax room. Those
supervisors, in turn, reported to Plaintiff. (Golden Dep. at
58-59; Rogan Decl. ¶ 5.) Plaintiff has denied this statement.
(Golden Decl. ¶¶ 25-27.)

The tax room supervisors interviewed applicants for
employment in the tax room and then forwarded their
recommendations to Plaintiff for review and approval. (Golden
Dep. at 60-61; Rogan Decl. ¶ 5.) Plaintiff has denied this
statement. (Golden Decl. ¶¶ 25-27.)

Plaintiff and her staff came in once a month on the weekend to audit client monthly statements. (Golden Dep. at 70.) Plaintiff has denied this statement. (Golden Decl. ¶ 21.)

Listed as Plaintiff's objectives and responsibilities in Plaintiff's 2002 year-end evaluation were: training and employee development, including creating a common staff objective; identifying additional training needs, completing mid-year and year-end reviews; and identifying promotional and career progressions for employees. (Sanchez Decl., Ex. B at 1; Golden Dep. at 74-75.) Plaintiff has admitted that these duties were listed in Plaintiff's 2002 year-end evaluations, but has denied that these duties comprised any significant portion of her day-to-day activities and has stated that the bulk of her day was taken up by low-level data-entry. (Golden Decl. ¶¶ 15-17, 19.)

Listed as Plaintiff's objectives and responsibilities in Plaintiff's 2002 year-end evaluation were: reviewing the prior year's service plan to access outstanding issues; identifying new ways to improve services; and "notifying management staff of recommendations." (Sanchez Decl., Ex. B at 2.) Plaintiff has admitted that these duties were listed in Plaintiff's 2002 year-end evaluation, but has denied that these

14

duties comprised any significant portion of her day-to-day activities and has stated that the bulk of her day was taken up by low-level data-entry. (Golden Decl. ¶¶ 15-17, 19.)

Reviewing the prior year's communication plan to assess any needed changes was listed as one of Plaintiff's objective and responsibilities in Plaintiff's 2002 year-end evaluation. (Sanchez Decl., Ex. B at 2.) Plaintiff has admitted that these duties were listed in Plaintiff's 2002 year-end evaluation, but has denied that these duties comprised any significant portion of her day-to-day activities and has stated that the bulk of her day was taken up by low-level data-entry. (Golden Decl. ¶¶ 15-17, 19.)

Developing a manual of policies, procedures and IRS regulations as a reference guide was listed as one of Plaintiff's objectives and responsibilities in Plaintiff's 2002 year-end evaluation. (Sanchez Decl., Ex. B at 3.) Plaintiff has admitted that these duties were listed in Plaintiff's 2002 year-end evaluation, but has denied that these duties comprised any significant portion of her day-to-day activities and has stated that the bulk of her day was taken up by low-level data-entry. (Golden Decl. ¶¶ 15-17, 19.)

Listed as Plaintiff's objectives and responsibilities in Plaintiff's 2002 year-end evaluation were: achieving a service level of 95%; monitoring 10 calls for every employee monthly to ensure professional quality and meeting with employees bi-weekly to present evaluations of calls and performance. (Sanchez Decl., Ex. B at 3-4.) Plaintiff has admitted that these duties were listed in Plaintiff's 2002 year-end evaluation, but has denied that these duties comprised any significant portion of her day-to-day activities and has stated that the bulk of her day was taken up by low-level data-entry. (Golden Decl. ¶¶ 15-17, 19.)

"Development of consolidated written procedures for the combined phone reps" was listed as one of Plaintiff's objectives and responsibilities in Plaintiff's 2002 year-end evaluation. (Sanchez Decl., Ex. B at 5-6.) Plaintiff has admitted that this duty was listed in Plaintiff's 2002 year-end evaluation, but has denied that this duty comprised any significant portion of her day-to-day activities and has stated that the bulk of her day was taken up by low-level data-entry. (Golden Decl. ¶¶ 15-17, 19.)

Cross training of representatives was listed as one of Plaintiff's objectives and responsibilities in Plaintiff's 2002

year-end evaluation. (Sanchez Decl., Ex. B at 12.) Plaintiff
has admitted that this duty was listed in Plaintiff's 2002 year-
end evaluation, but has denied that this duty comprised any
significant portion of her day-to-day activities and has stated
that the bulk of her day was taken up by low-level data-entry.
(Golden Decl. ¶¶ 15-17, 19.)

Plaintiff's job responsibilities increased over time.
(Golden Dep. at 64-65.) Plaintiff has denied this
characterization of her deposition. (Golden Decl. ¶¶ 11-19.)

Plaintiff stated in her 2003 evaluation that training
identified by management "has been addressed and is on-going"
and that she was "to appoint a staff member to schedule
development class." (Sanchez Decl., Ex. C at 1.) Plaintiff has
admitted that this was stated in Plaintiff's 2003 evaluation,
but has denied that she appointed "a staff member to schedule
development class." (Golden Decl. ¶¶ 15-17, 19.)

The duties Plaintiff was expected to perform are
reflected in a completed questionnaire used by Merrill to
evaluate whether the MLSN Supervisor position was properly
"banded" for compensation purposes. (Theologis Dep. at 114-17;

Theologis Decl. ¶¶ 1, 4, 6 & Ex. B.) Plaintiff has denied this characterization of the Theologis Deposition.

The "Summary of Position" section of the questionnaire for Plaintiff's job position states that "[t]he MLSN Supervisor is responsible for leading, managing and developing employees to maximize each individual's individual performance." (Theologis Decl. ¶ 7 & Ex. B.) Plaintiff has admitted that the summary of position on the questionnaire makes this statement but has denied that she was responsible for leading, managing and developing employees to maximize each individual's individual performance. (Golden Decl. ¶¶ 15-17, 19.)

This questionnaire, under the heading "Responsibility/ Accountability/Specific Duties," lists "the primary duties of the job," of MLSN Supervisor, including spending 60% of his or her time "[l]ead[ing] and manag[ing] employees through development," while 30% was to be spent managing day-to-day operations, 10% on projects and strategic initiatives and 5% on MIS reporting.[1] (Theologis Decl. ¶ 8 & Ex. B.) Plaintiff has admitted that the questionnaire makes this statement but has denied that her time at work was actually broken down as set forth in the questionnaire. (Golden Decl. ¶¶ 15-17, 19.)

[1] The Court notes that these percentages total to 105%.

18

Golden's supervisor has confirmed that all of these percentages were accurate. Moreover, these are the types of tasks on which Plaintiff's performance was evaluated. (Rogan Decl. ¶ 7.) Plaintiff has denied this statement. (Golden Decl. ¶¶ 11-13.)

The job evaluation questionnaire also stated under "Knowledge, Skills and Experience" that no specialized project knowledge was needed for the supervisor position. (Theologis Decl. ¶ 9 & Ex. B.)

Under the heading "Decision-Making/Supervisory Authority," examples of the types of decisions made on a regular basis by MLSN Supervisors included "[h]uman resources policy" and "[h]iring of new employees." (Theologis Decl. ¶ 10 & Ex. B.) Plaintiff has admitted that the questionnaire contains such a statement but has denied that she made decisions on a regular basis regarding human resource policy and hiring new employees. (Golden Decl. ¶¶ 15-17, 19).

The "Contribution and Impact" section of the questionnaire stated: "The MLSN Supervisor is responsible for ensuring that their employees are providing the best service

possible and the correct information to each Branch Office
client they encounter on a daily basis." The Strategic Value
section of the questionnaire stated: "They are responsible for
maintaining employee morale and satisfaction as well as employee
development and performance." (Theologis Decl. ¶¶ 11-12 & Ex.
B.) Plaintiff has admitted that the questionnaire contains such
a statement but has denied that she ensured that their employees
provided the best service possible and the correct information
to each Branch Office client they encounter on a daily basis and
has denied that she had any input into employee morale,
satisfaction, development and performance. (Golden Decl. ¶¶ 15-
17, 19.)

Some supervisors in the units under Section Manager
Sean Rogan had assistant supervisors to help them accomplish
some of their duties. Golden did not have an assistant
supervisor. Assistant supervisors were sometimes known as leads
and were non-exempt employees. Assistant supervisors' duties
differed significantly from that of supervisors in a number of
ways. First, the supervisor had significant responsibilities in
the areas of leadership and employee development that assistant
supervisors generally did not have, or if they did have such
duties, they comprised a minor portion of their
responsibilities. Second, the supervisor had overall

20

responsibility for supervising the unit's day-to-day activities. Third, assistant supervisors were expected to and did perform a significant amount of the same work performed by the other telephone representatives, such as staffing and receiving directly non-elevated calls from clients and responding to their requests. (Rogan Decl. ¶ 8.) Plaintiff has denied this statement. (Golden Decl. ¶¶ 14-29, 41-43.)

The questionnaire for the Assistant Supervisor position indicates under "Responsibility/Accountability/Specific Duties," which lists "the primary duties of the job," that the MLSN Assistant Supervisor is expected to spend 60% of his or her time managing day-to-day operations, 30% assisting team members with questions, 10% on MIS reporting and 5% on projects and strategic initiatives. Leading and managing employees through development is not listed among the primary job duties of the MLSN Assistant Supervisor position.[2] (Theologis Decl. ¶ 13 & Exs. B, C.) Plaintiff has denied this statement. (Golden Decl., Exs. A, B.)

Under "Decision-Making/Supervisory Authority," the Assistant Supervisor questionnaire indicates that the position does not require customary supervision of at least two or more

---

[2] The Court notes that these percentages total to 105%.

full time employees. Furthermore, there is no mention of human resources policy or hiring of new employees among the types of decisions that could be made on a regular basis by Assistant Supervisors. (Theologis Decl. ¶ 14 & Ex. C.) Plaintiff has denied this statement. (Golden Decl., Exs. A, B.)

Under "Contribution and Impact," the questionnaire for Assistant Supervisors expressly stated that Assistant Supervisors are expected to "handl[e] MLSN phone calls when volumes require it." (Theologis Decl. ¶ 15 & Ex. C.) Plaintiff has denied this statement. (Golden Decl., Exs. A, B.)

While Supervisors are classified as exempt, Assistant Supervisors are classified as non-exempt. Assistant Supervisors' job duties are more related to the processing of the unit's work. Their primary job duties do not exhibit the leadership and management skills and competencies set forth by Merrill Lynch. Their responsibilities do not include coaching employees, giving them feedback, assisting them with their career goals or holding one-on-one meetings. Moreover, Assistant Supervisors have very limited, if any, involvement in employee development. Finally, Assistant Supervisors generally do not have authority to make and/or recommend personnel decisions such as discipline, promotions, hiring and tiring.

22

(Theologis Decl. ¶ 16.) Plaintiff has denied these statements. (Golden Decl., ¶¶ 41-42, Exs. A, B.)

The representatives who reported to Plaintiff earned on average a biweekly salary of $1,239 in 2003 and $1,299 in 2004. (Rozolis Decl. ¶ 5.) Plaintiff has denied this statement. See Defendant's Ex. C at 153-55.)

**The Summary Judgment Standard**

In deciding a motion for summary judgment, a court shall render judgment "forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000).

The moving party has the initial burden of showing that there are no material facts in dispute, Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970), and can discharge this burden by demonstrating that there is an absence of evidence to support the nonmoving party's case, Celotex, 477 U.S. at 325.

23

The nonmoving party then must come forward with "specific facts showing that there is a genuine issue for trial," Fed. R. Civ. P. 56(e), as to every element "essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

The court "must resolve all ambiguities and draw all reasonable inferences in favor of the party defending against the motion." Eastway Constr. Corp. v. New York, 762 F.2d 243, 249 (2d Cir. 1985). However, the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). If there is not, summary judgment is proper. See id. at 249-50.

## Merrill's Motion is Granted

A review of the facts as set forth above reveals a conflict between the facts as set forth in Golden's deposition and the facts as described in her affidavit submitted in opposition to the Merrill motion. The differences are stark and on this motion determinative.

24

In the Second Circuit "a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." Raskin v. Wyatt Co., 125 F.3d 55, 63 (2d Cir. 1997) (quoting Hayes v. New York City Dep't of Corr., 84 F.3d 614, 619 (2d Cir. 1996)). Golden admitted at deposition that she could not estimate the time she spent on any of her job duties but in her affidavit as demonstrated above, she maintains that she spent 70-80% of her time on data entry. Golden also admitted at deposition to performing numerous supervisory duties but now asserts in her declaration that she performed no supervisory duties. These contradictions in her declaration were detailed in Defendant's Evidentiary Objections to Declaration of Stacey Golden.

Courts in this Circuit have rejected such attempts to rely on declarations that contradict the witness's prior deposition testimony and have granted summary judgment even where the purported new evidence would otherwise create a triable issue of fact. See, e.g., Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001) (affirming summary judgment for employer where plaintiff previously claimed harassment was due to dispute with co-worker over union election or alleged affair with another co-worker, and gender discrimination only mentioned in

her affidavit); Durant v. A.C.S. State & Local Solutions, Inc., 460 F. Supp. 2d 492, 494-95, 498 (S.D.N.Y. 2006) (granting employer summary judgment based on plaintiff's deposition testimony as to two instances of sexual harassment forming the basis for her lawsuit and declining to consider plaintiff's affidavit asserting other instances of alleged sexual harassment); Mitchell v. Washingtonville Cent. Sch. Dist., 992 F. Supp. 395, 409-10 (S.D.N.Y. 1998) (granting summary judgment in disability discrimination case and rejecting plaintiff's affidavit that conflicted with his deposition testimony regarding his essential duties), aff'd, 190 F.3d 1 (2d Cir. 1999). Indeed, courts in the Second Circuit are particularly reluctant to credit affidavit testimony that alleges critical, obviously material facts that were not mentioned at deposition, noting that such circumstances strongly suggest a sham affidavit. See Bunting v. Nagy, 452 F. Supp. 2d 447, 460 (S.D.N.Y. 2006).

## Golden's Duties Were Supervisory in Nature

Asked at her deposition if she had any estimate of how much time she spent on her various job duties at Merrill Lynch, Golden responded that she did not:

```
    Q.    Out of all the duties that we have discussed as
          you sit here today, can you give me an estimate
          of how many hours you spent on each of them
          during a normal week?
    A.    No, I have no idea.
    Q.    During a normal month?
    A.    No, I have no idea.
    Q.    During a normal year?
    A.    No, I don't know.
```

(Golden Dep. at 152.)   In her affidavit, Golden has stated that

she was unable to provide an estimate at her deposition because

the question was asked at the end of the session and because the

question was somehow unclear to her.   (Golden Decl. ¶ 36.)


         However, Golden was specifically asked, well before

the halfway point of the deposition, to estimate the amount of

time she spent taking incoming calls and, separately, monitoring

calls, but she was unable to do so.   (Golden Dep. at 55, 68-69.)

In addition, Golden was expressly instructed that she should let

counsel know if she did not understand a question and that

counsel would otherwise assume that she understood.   (Golden

Dep. at 5.)   She did not state that she misunderstood the

question or otherwise seek clarification, nor did her counsel

interpose any objection.   (Id. at 152); see Fed. R. Civ. P.

32(d)(3)(B) (objections to form waived if not made at time of

deposition).   She also later reviewed and signed the transcript

without changing her answers or noting any confusion regarding

the question.  See Supp. Decl. ¶ 3 & Ex. B.  For these reasons, Plaintiff is bound by her admission that she had "no idea" how long she spent on any of her various job duties, and anything in her declaration to the contrary will be disregarded.  (Golden Dep. at 152.)

Although Golden was asked numerous times at her deposition what her job duties were as a MLSN supervisor, she did not mention "data entry," yet she now claims that she spent 70-80% of her time on this function.  (Opp. at 4, 13, 19; Golden Decl. ¶ 16.)

Golden now contradicts her deposition testimony by asserting that it came up when she was discussing the change in her job duties in late 2002 or early 2003.  (Opp. at 20.)  The transcript, however, refers to her "paperwork," meaning that "reviewing the timecards, doing the scheduling," increased because the number of people she supervised had doubled. (Golden Dep. at 64-65.)  She further noted that she had to take elevated calls from this larger group of employees.  (Id. at 65.)  She also mentioned increased "processing," which either referred to the increase in processing paperwork from having a larger staff or was simply erroneous, because as Golden testified, "processing" functions were transitioned out of her

28

unit in the last quarter of 2002 as reflected in her year-end evaluation." (Golden Dep. at 90.) In either event, her reference to "processing" does not equate to "data entry," especially where she did in fact mention "data entry" as one of the duties she performed as a state tax analyst prior to becoming a MLSN Supervisor. (Golden Dep. at 28.)

The explanation Golden offers in her affidavit for the change in her duties, i.e., an increased emphasis on metrics, is inconsistent with her deposition testimony regarding the impact of the metrics on her job. She admitted that she monitored how her representatives "were speaking on the phone" and looked at "statistical reports" of employees' calls in connection with achieving an "annual service level of 95 percent," but she did not mention inputting data. (Golden Dep. at 82; Sanchez Decl. Ex. B at 4.) Moreover, at deposition, she denied having done anything to improve her unit's performance against its metric goals: "There wasn't really anything that I could do to improve those goals. It is just how the calls come in. I don't do anything to improve them or hurt the scores." (Golden Dep. at 87.) The assertion in her declaration that she took over data entry for the calls to create the appearance of improved performance (i.e., the scores) contradicts her deposition testimony and will be disregarded.

29

Golden was specifically asked at her deposition whether she had any other job duties besides those about which she had already testified. She responded, "Not that I can think of." (Golden Dep. at 72.) She is bound by her testimony and is not permitted to avoid summary judgment by submitting a declaration adding new duties after the fact. See Magilton v. Tocco, 379 F. Supp. 2d 495, 507 n.5 (S.D.N.Y. 2005) (refusing to allow plaintiff to avoid summary judgment by relying on declaration identifying three additional counseling memos that he had failed to identify at deposition). Golden never identified data entry as one of her job duties at her deposition.

In claiming that she had virtually no managerial authority, Opp. at 21, Golden in effect has denied her deposition testimony that she performed the numerous supervisory duties as set forth by Merrill's motion. (Def. Memo. at 2-3; Golden Dep. at 50-54, 57-58, 63, 73-76, 82-85, 111-112; Sanchez Decl. Exs. B, C.) Likewise, she has failed to confront her admissions at deposition that she was evaluated on her supervisory duties, that the comments in her evaluations were accurate, and that she agreed with the objectives set out for her unit and worked to achieve them. (Def. Memo. at 4-5; Golden

30

Dep. at 73-75, 77, 97, 101, 109; Sanchez Decl. Ex. B.) Golden asserted in her declaration that the employees who supervised the seasonal tax room did not report to her and that Merrill's statement to the contrary is a "falsehood." (Golden Decl. ¶ 25.) The following is her deposition testimony:

> Q. You were the supervisor of the tax room?
> A. During the tax season they would assign one of the staff members as, underneath me, to be supervisor inside the tax room.
> ...
> Q. They reported to you?
> A. Yes.

(Golden Dep. at 59.)

In the resume she submitted to her subsequent employer, MetLife, Golden expressly stated that her duties at Merrill included "Managing the tax seasonal call center staffed with 50 temporary employees." (Supp. Decl. ¶ 4 & Ex. C.) Merrill did not become aware of this document until after filing its Motion, thus it was not included in its moving papers. It may, however, include the reference in a summary judgment reply brief even if it was known to the moving party at the time the motion was made. Ruggiero v. Warner-Lambert Co., 424 F.3d 249, 252 & n.3 (2d Cir. 2005).

31

Golden has asserted that she had no responsibility with respect to hiring, Opp. at 15, again contradicting her deposition testimony regarding the tax room:

> Q. Was it part of your responsibilities to help hire the temps for that tax phone room?
> A. There was a handful that did interviews for the consultants.
> . . .
> Q. The people who did the interviews would give a recommendation to you?
> A. Yes.
> Q. You would review it, then pass it on if you agreed?
> A. Yes.

(Golden Dep. at 60-61.) She is, however, bound by testimony attesting to her involvement in the hiring, training, development, evaluation and discipline of employees. (Golden Dep. at 50-54, 75, 104; Sanchez Decl. Exs. B, C.) Furthermore, Golden's resume confirms that she was responsible for "all administrative/human resources responsibilities of 18 . . . employees." (Supp. Decl. ¶ 4, Ex. C.) Based on the authorities cited above, the portions of Golden's affidavit which conflict with her deposition will be disregarded.

## The Exempt Classification by Merrill Was Appropriate

32

Both the FLSA and the NJWHA provide exemptions from their overtime requirements for persons employed in capacities that are "executive, administrative, or professional." FLSA § 13(a)(1); NJWHA § 34:11-56a4.

Under the federal regulations applicable during Plaintiff's employment with Merrill, an employee had to receive a salary of at least $250 per week in order to qualify for the executive exemption.[3] 29 C.F.R. § 541.1(f)(2003). This payment must satisfy the so-called "salary basis" test, i.e., it must be "a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to deduction because of variations in the quality or quantity of the work performed." 29 C.F.R. § 541.602 (formerly codified at 29 C.F.R. § 541.118(a)).

New Jersey generally follows the federal salary basis test, except the employee must receive a salary of at least $400 per week. See N.J. Admin. Code § 12:56-7.1(a).

---

[3] The regulations were amended effective August 23, 2004, and now require a salary of at least $455 per week. 29 C.F.R. § 541.100(a)(1). Plaintiff had left Merrill by that date, however, and in any event her salary exceeded even that level.

33

Golden was paid a salary exceeding $400 per week while employed by Merrill as a MLSN Supervisor. (Golden Dep. at 113, 115; Rozolis Decl. ¶¶ 2-3 & Ex. A.) Her compensation satisfied the salary basis requirement for the executive exemption.

Under the FLSA, an employee who satisfies the salary basis test and whose "primary duty consists of the management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof and includes the customary and regular direction of the work of two or more other employees therein" is exempt from overtime requirements. 29 C.F.R. § 541.119(a)(2003). This set of requirements is commonly referred to as the "duties test."

Whether the employee's "primary duty" consists of management is determined by "all the facts in a particular case":

   In the ordinary case it may be taken as a good rule of
thumb that primary duty means the major part, or over
50 percent, of the employee's time. Thus, an employee
who spends over 50 percent of his time in management
would have management as his primary duty. Time alone,
however, is not the sole test, and in situations where
the employee does not spend over 50 percent of his
time in managerial duties, he might nevertheless have
management as his primary duty if the other pertinent
factors support such a conclusion. Some of these
pertinent factors are the relative importance of the

34

managerial duties as compared with other types of duties, the frequency with which the employee exercises discretionary powers, his relative freedom from supervision, and the relationship between his salary and the wages paid other employees for the kind of nonexempt work performed by the supervisor.

29 C.F.R. § 541.103 (2003).

The requirements under the NJWHA are similar. See N.J. Admin. Code § 12:56-7.1; Marx v. Friendly Ice Cream Corp., 882 A.2d 374, 383-84 (N.J. Super. Ct. App. Div. 2005) (explaining that the subsections of New Jersey's executive exemption regulation serve the "same function" as the subsections of the federal regulation: ensuring that an employee's primary duty consists of management). Unlike the federal duties test, the New Jersey duties test also includes an express quantitative component such that, in general, an executive employee may spend no more than 20% of his or her time performing non-exempt duties. See id. at 384; N.J. Admin. Code § 12:56-7.1 (a)(5). This requirement is satisfied, however, where the realistic requirements of the job demand that no more than 20% of the employee's time be spent on non-exempt duties, even if the employee actually performed such duties a greater percentage of the time. See id. at 387.

35

Golden exercised discretionary powers, was subject only to general supervision, and earned significantly more than those who reported to her. She scheduled employees; reviewed and approved time sheets; developed and trained employees and assisted them with any questions they had; monitored calls to ensure that employees performed satisfactorily; reviewed productivity reports; ensured her Unit was meeting performance objectives; evaluated and reviewed employees; maintained employee morale; addressed performance issues; recommended discipline; ran team meetings; and developed policies and procedures for use by employees. (Golden Dep. at 50-54, 57-58, 63, 73-76, 82-85, 111-12; Sanchez Decl., Ex. B.)

Courts presented with facts similar to those established here have granted summary judgment to employers. In Smith v. First Union Nat'l Bank, 202 F.3d 234 (4th Cir. 2000), the Fourth Circuit affirmed a grant of summary judgment dismissing plaintiff's FLSA claim where plaintiff, a former team leader in the collections department, admitted that she supervised, trained, and reviewed the adjustors on her team. 202 F.3d at 250-52. Here, Golden's job description listed such duties as: "[m]aintain quality control checks to ensure corporate and regulatory compliance"; "[e]stablish productivity and quality goals with team and management"; and "[e]ncourage

36

individual achievement and provide ongoing feedback, and implement plans to improve employee satisfaction." (Sanchez Decl., Ex. B at 1; Golden Dep. at 74-75.)

Golden admitted at her deposition that she was evaluated on the basis of supervisory skills, such as training and employee development, identifying ways to improve business processes and ensuring that her staff met its productivity and quality goals. (Golden Dep. at 73-75, 77, 97; Sanchez Decl., Ex. B.) Furthermore, Golden worked subject only to general supervision. Her manager worked in a different building, they met in person only once every week or two and typically communicated only about once per day by telephone and twice per day by email. (Golden Dep. at 126-27; Theologis Decl., Ex. B; Rogan Decl. ¶ 6.)

Golden testified that she performed some duties other than the supervisory duties described above, such as handling elevated calls, auditing client statements once per month and sometimes handling incoming calls during busy periods. (Golden Dep. at 65-70.) Plaintiff handled elevated calls when a supervised employee "could not solve the customer's problem." (Id.) The escalated calls presented difficult questions that representatives could not answer, or were placed by upset

37

callers whom representatives could not placate. (Id. at 65-67.) Golden admitted at her deposition that she used her judgment in determining how to handle such calls. (Id. at 66-67.)

When presented with similar evidence in Smith, the Fourth Circuit held that the plaintiff's performance of her employees' "more complex" tasks was insufficient as a matter of law to create a dispute of fact regarding her primary duty. 202 F.3d at 251. The plaintiff there claimed that "she spent between 80 and 90% of her time doing the work of an adjustor," the position of the employees she supervised. Id. But the Fourth Circuit observed that the plaintiff's "work as an adjustor . . . was with accounts that were delinquent or within 'problem areas'" and reasoned that it was therefore managerial:

> The Regulations expressly recognize that employees who are responsible for the more difficult and complex tasks in a department will have management as their primary duty. See 29 C.F.R. §541.103 ("In the data processing field an employee who directs the day-to-day activities of a single group of programmers and who performs the more complex or responsible jobs in programming will be considered to have management as his primary duty."). Smith's work as an adjustor therefore was in a managerial capacity.

Id. The Fourth Circuit affirmed the district court's holdings that the plaintiff's primary duty consisted of management, and

38

that her employer was therefore entitled to summary judgment. Id. at 252.

Golden's testimony that she joined her staff in conducting weekend audits of client statements once per month does not create an issue regarding her primary duty. Neither the nature of the audit nor the amount of time Plaintiff spent on it was "significant enough to compel a different outcome in the 'primary duty' analysis." See Posely v. Eckerd Corp., 433 F. Supp. 2d 1287, 1306 (S.D. Fla. 2006).

Like the store managers in Posely, Plaintiff had "significant managerial responsibilities" that were not "negate[d]" by her participation in a non-managerial activity. See id. The fact that, once per month, Plaintiff joined her staff in conducting an audit of client statements does not change the conclusion that Plaintiff's primary duty consisted of management. See id. at 1307.

Golden has testified that, in addition to handling escalated calls, she also answered routine calls when her Unit was shorthanded or the volume of calls was high. (Golden Dep. at 68-70.) Although she had no estimate as to how often this occurred, she admitted this did not occur daily. Id. at 68.

39

Even when viewed in the light most favorable to Golden, her testimony is insufficient to defeat summary judgment.

The Second Circuit has established that even supervisors who must lend an "extra hand" during high volume periods "have, as their 'primary duty,' managerial responsibilities." Donovan v. Burger King, 675 F.2d 516, 518, 520 (2d Cir. 1982). The court found it "clear that the restaurants could not operate successfully unless the managerial functions . . . were performed," and that "much of the oversight of the operation c[ould] be carried out simultaneously with the performance of non-exempt work" Id. at 521; accord Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, 69 Fed. Reg. 22122, 22136 (Apr. 23, 2004) (describing the amended regulation, which confirms that "[c]oncurrent performance of exempt and nonexempt work does not disqualify an employee from the executive exemption," as "consistent with current case law").

New Jersey state law is in accord. In Marx, the Appellate Division affirmed that the plaintiffs' primary duty was management in spite of their employer's expectation that they "step-in when there [wa]s a 'bottleneck.'" 882 A.2d at 382. The court also concluded, as in Burger King, that "fill-

40

in" tasks could be performed simultaneously with managerial ones. Id. at 381.

Under the reasoning of these cases, Golden's testimony that she sometimes answered routine calls is insufficient to create a genuine issue of material fact. Like the plaintiffs in Burger King, Golden's managerial duties were "principal" because they were more critical to the success of her unit than any others she may have performed. See 675 F.2d at 521; Rogan Decl. ¶ 4.

The Second Circuit has recognized that the relevant federal regulation "expressly states that 'time alone . . . is not the sole test'" of an employee's primary duty. Burger King, 675 F.2d at 521 (quoting 29 C.F.R. § 541.103).

Here, the relative importance of Golden's managerial duties and other factors considered in determining her primary duty support the conclusion that she satisfies the executive exemption test as a matter of law. Indeed, Plaintiff's unit "could not operate successfully" unless her managerial duties, including "scheduling employees," were performed. Burger King, 675 F.2d at 521. Golden's inability to remember the time she

spent in performance of managerial duties does not preclude summary judgment.

Although Plaintiff's claim requires a "quantitative assessment" under the NJWHA, that assessment is not based solely on the actual hours she spent on non-managerial work. Marx, 882 A.2d at 386. Rather, compliance with the NJWHA's quantitative requirement can be established as a matter of law based on the "realistic requirements" of Plaintiff's job. See id. at 386-87.

As the Appellate Division explained in Marx, basing a quantitative assessment solely on the plaintiff's "actual hours" would be "unfair to the employer" because "managers may schedule their staff time poorly, through inexperience, incompetence or design, thereby creating the necessity that justifies their own performance of non-exempt work and receipt of overtime pay." 882 A.2d at 386. Thus, in Marx, the court held that an employer satisfied the quantitative element of the NJWHA despite the plaintiffs' testimony that "low staffing levels often require[d] them to spend as much as eighty percent of their day lending a hand" to their employees. Id. at 382-83. The employer there had submitted evidence that the plaintiffs' "significant managerial responsibilities were sufficient to occupy the workweek," and that these requirements were realistic because it

staffed its stores based upon criteria related to the demand for labor. Id. at 387.

Plaintiff's evaluation form listed many significant managerial responsibilities, including training and developing employees, completing their mid-year and year-end reviews, monitoring ten calls for each of them monthly, meeting with each of them biweekly, and developing a manual of policies, procedures, and regulations for them to use as a reference guide. (Sanchez Decl., Ex. B.) As described above, Golden admitted in her deposition testimony that she performed a host of other supervisory duties. (Golden Dep. at 50-54, 57-58, 63, 73-76, 82-85, 111-12.) When applied to Plaintiff's team of five to six, and later ten to twelve, employees, these duties were "sufficient to occupy the workweek." Marx, 882 A.2d at 387. Indeed, her direct supervisor has confirmed that Plaintiff should have been spending all, or virtually all, of her time on these supervisory duties. (Rogan Decl. ¶ 7.)

Several factors demonstrate that Merrill's expectations regarding Golden's job duties were also "realistic." First, Merrill staffed Plaintiff's unit according to need. Golden testified that Merrill added up to fifty temporary employees during the busy tax season. (Golden Dep. at

43

58-59.) This evidence of Merrill's staffing policies negates any inference that it restricted staffing arbitrarily or in bad faith. See Marx, 882 A.2d at 387. Comments on Plaintiff's evaluations indicated that her objectives were not merely an "idealized job description." Id. at 386. To the contrary, Plaintiff herself commented that she was able to "meet the majority of [her] objectives." (Sanchez Decl., Ex. B at 19.) Finally, Plaintiff's supervisors praised her for realizing a "good grasp of her role," and for "show[ing] outstanding results." (Sanchez Decl., Ex. B at 19, Ex. C at 3.) Under these circumstances, if Golden had spent time on non-managerial work, she would not have been meeting Merrill's reasonable expectations. See Marx, 882 A.2d at 387. Accordingly, the quantitative element of the duties test is satisfied here.

In sum, Plaintiff's duties satisfied the requirements of the federal and New Jersey state duties tests for the executive exemption.

Golden has cited Cohn v. Decca Dist. Corp., 50 F. Supp. 270, 271 (E.D. Pa. 1942) an instance where the plaintiff was promoted in order to deprive hourly employees of overtime and performed exactly the same duties as he had before, except that he had the right to recommend the hiring and firing of

employees. Here, by contrast, Golden admitted that she performed many supervisory duties, and the uncontradicted evidence establishes that these duties were expected to occupy all or virtually all of her time. In Reeves v. ITT, 357 F. Supp. 295, 300 (W.D. La. 1973), cited by Golden, the executive exemption did not apply because the employee, unlike Plaintiff here, did not "manage a customarily recognized department or subdivision" or regularly direct the work of two or more employees. Sack v. Miami Helicopter Serv., Inc., 986 F. Supp. 1456, 1465-67 (S.D. Fla. 1997), cited by Golden, involved an individual who performed manual helicopter inspection work, not white collar office work, and the court specifically found that the position involved significant supervisory duties requiring the majority of plaintiff's time. Dye v. Family Mkt., Inc., No. 18-1331, 1982 U.S. App. LEXIS 21618, at *3, *13 (10th Cir. Feb. 22, 1982), upheld the finding that a baker who spent 90 percent of his time baking and who earned the same amount as those he supervised was not an exempt executive employee. Finally, Martin v. Indiana Michigan Power Co., 381 F.3d 574, 582-583 (6th Cir. 2004) and Rainey v. Am. Forest & Paper Ass'n, 26 F. Supp. 2d 82, 88-89 (D.D.C. 1998) are irrelevant because they address the administrative (not executive) exemption.

45

Golden has also asserted that Merrill bears the burden of establishing the exemption by "clear and convincing evidence," Opp. at 8. However, in the Second Circuit, employers bear the burden of proof to establish an exemption only by a preponderance of the evidence. Marshall v. Burger King Corp., 504 F. Supp. 404, 406-07 (E.D.N.Y. 1980), aff'd, 675 F.2d 516. As set forth above and in its papers, Merrill has met its burden here.

**Conclusion**

Summary judgment dismissing the Complaint is appropriate and is granted.

Submit judgment on notice.

It is so ordered.

**New York, N.Y.**
**December** *6* **, 2007**

**ROBERT W. SWEET**
**U.S.D.J.**

46